STATE of Wisconsin, Plaintiff-Respondent,

v.

Charles E. DUKES, Defendant-Appellant.

Court of Appeals

*No. 2006AP2127–CR. Submitted on briefs April 3, 2007.*
*—Decided May 8, 2007.*

2007 WI App 175

(Also reported in 736 N.W.2d 515.)

211

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert N. Meyeroff* of *Robert N. Meyeroff, S.C.*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*,

attorney general, and *Jonathan J. Kinkel*, assistant attorney general.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. CURLEY, J. Charles E. Dukes appeals from the judgment of conviction entered after a jury found him guilty of possession of a controlled substance, cocaine (more than 40 grams), with intent to deliver, as a party to the crime, while armed, contrary to Wis. Stat. §§ 961.16(2)(b)1., 961.41(1m)(cm)4., 939.05, and 939.63 (2003–04),[1] and keeping a drug house, as a party to the crime, contrary to Wis. Stat. §§ 961.42(1) and 939.05. Dukes also appeals the order denying his post-conviction motion. Dukes contends that: (1) there was insufficient evidence to sustain the conviction for possession of a controlled substance; (2) other acts evidence regarding a drug purchase by Paul McAdams was irrelevant and prejudicial; and (3) the verdict was not unanimous on the controlled substance and drug house counts, entitling him to a new trial. We conclude that: (1) there was sufficient evidence to prove possession of a controlled substance; (2) the evidence of a previous drug purchase was not other acts evidence, but relevant evidence that was properly admitted; and (3) the verdict on the drug house count was unanimous, but the verdict on the controlled substance count was not unanimous. Therefore, we affirm on the drug house count and reverse and remand for a new trial on the controlled substance count.[2]

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[2] The Honorable Michael B. Brennan presided over the pretrial proceedings. The Honorable William W. Brash presided over the trial, sentencing, and postconviction motion.

## I. Background.

¶ 2. On June 26, 2004, at approximately 5:10 a.m., officers of the Milwaukee Police Department executed a no-knock search warrant at 450 North 33rd Street, Apartment 1, in Milwaukee. Police found several individuals inside. In a bedroom, officers located Leonard Dotts (Leonard), who told police that he had lived in the apartment for several years. Leonard's grand-nephew, Deonte Dotts (Deonte), was found in another bedroom, along with his girlfriend and the mother of his son, Latoyna Board, and three children. In the living room area, police found Dukes sleeping on the floor, close to a Glock handgun containing seventeen rounds of ammunition in the magazine and one round in the chamber. Dukes's girlfriend, Darnicsha Cotton was found sitting in a chair in the living room area. Also in the living room area, police found Christian Beanland sitting in a chair next to a bag containing nine pieces of cocaine base.

¶ 3. In a hallway, officers recovered a box of MagTech 9mm cartridges, a Glock 10–count magazine containing eight rounds, a box of Remington .357 cartridges, and a digital scale containing cocaine base. In the bedroom in which Deonte was found, police also recovered a purse containing a bag of cocaine base that weighed 48.4 grams, a bag of cocaine powder that weighed 16.5 grams and $300, a body armor vest, two digital scales, a small bag of marijuana, a box of .380 caliber Winchester ammunition, two razor blades with cocaine residue on them, and more than $800. Dukes, Leonard, Deonte, Beanland and Board were arrested.

¶ 4. While in custody, Dukes made several telephone calls that were recorded by law enforcement in which he discussed guns, including the Glock handgun,

and whether, in the course of executing the search warrant, police had found anything in the basement. Based on Dukes's reference to the basement, police returned to 450 North 33rd Street on June 29, 2004, and searched the basement. Police discovered a Mac-10–style submachine gun containing eight 9mm rounds, matching the ammunition found during the earlier search. Police also recovered a bag of cocaine that weighed 106.2 grams and over $3,000 in cash.

¶ 5. Dukes was charged with possession of a controlled substance, cocaine (more than 40 grams), with intent to deliver, as a party to the crime, while armed; possession of a firearm by a felon, as a party to the crime; and keeping a drug house, as a party to the crime. The case was tried to a jury.

¶ 6. Following *voir dire*, counsel discussed the State's intention to introduce testimony about a drug deal that had taken place at 450 North 33rd Street on May 27, 2004, involving a Paul McAdams. The assistant district attorney told the court that officers would testify that they saw McAdams enter the house and leave two minutes later, that they stopped his vehicle and searched it, and that they found items during the search. Defense counsel likened the McAdams evidence to a "Pandora's box," but eventually explained that he was only concerned about hearsay statements by McAdams being admitted. The State assured the defense that no one would testify as to what McAdams said.

¶ 7. The State's opening statement mentioned that before police executed the search warrant on June 26, 2004, police observed numerous people go into 450 North 33rd Street and leave a short time later, and that when police observed McAdams leave 450 North 33rd

Street, they followed him, stopped him, and found crack cocaine and a crack pipe in his van.[3]

¶ 8. Detective Daniel Carter, who had been involved in surveillance of 450 North 33rd Street, testified that he saw people come, stay for two or three minutes, and leave, and explained that such traffic was consistent with the operation of a drug house. He admitted, however, that the building had approximately eight apartments, and that, from his standpoint, he was unable to see from which unit the people appeared to be purchasing drugs. Carter also testified that on May 27, 2004, a person later identified as McAdams pulled up in a van, entered the building, left two minutes later and drove off, at which point he and his partner followed the van, stopped it due to a traffic violation, and, suspecting that McAdams had purchased illegal drugs, searched the car. The assistant district attorney then asked Carter whether they found "anything related to your drug investigation . . . ." Defense counsel objected on grounds that since the McAdams incident occurred on May 27, and the search warrant was executed on June 26, the question was "too far and too remote to form the charge in this case" and "too remote to have any probative value." The matter was discussed outside the presence of the jury. The court noted that the State

---

[3] In his opening statement, defense counsel stated that McAdams entered 450 North 33rd Street at the direction of police. The State objected, and after a discussion outside the presence of the jury, where it was explained to defense counsel, who thought McAdams had made a controlled buy, that McAdams never did, the court determined that the State could raise the issue with the detectives because the jury had already heard defense counsel's erroneous statement. Because the court later disallowed testimony about McAdams the State never asked the question.

must "tie together" the McAdams incident with Dukes. The State made an offer of proof, explaining that although the State could not present a specific reference to the McAdams drug purchase, Dukes's statements in his phone conversations from jail show that he was in the house, aware of the drug dealing, and stressed that the issue is the weight of the McAdams evidence and not its admissibility. The court ultimately ruled that any more testimony about McAdams would be disallowed.

¶ 9. The State called detectives Denny Galipo and Keith Thrower, who described the execution of the search warrant. The State also played the tape recordings of Dukes's telephone conversations from jail.[4] Cotton and Dukes's sister, Kawanda Sherrod, testified for the defense.

¶ 10. The jury returned verdicts of guilty on all three counts. After the verdict was read, the court polled the jury. When the court asked Juror 17 whether guilty were her verdicts on each count, she responded that she had "some problems with some things," as a result of which she was taken aside and questioned individually. She stated that she "didn't feel as though he was guilty of the weapon['s charge] or anything like that." The court went over the three verdicts with Juror 17 and, after discussing her answers with counsel, concluded that she had stated that she found Dukes guilty of counts one and three, but not guilty of count two. On this basis, the State agreed to dismiss count two, and judgment was entered as to counts one and three. Dukes was sentenced to concurrent terms of seven years' imprisonment and six years' extended

---

[4] The recordings included street language and were interpreted by a detective for the jury.

supervision on count one, and one year's imprisonment and one year's extended supervision on count three.

¶ 11. Dukes filed a postconviction motion contending that there was insufficient evidence to sustain the conviction for possession with intent to deliver, that the McAdams evidence was irrelevant and prejudicial, entitling him to a new trial on the drug house count, and the verdict was not unanimous. The trial court denied the motion, concluding that the evidence was sufficient to sustain the drug conviction, the evidence regarding McAdams did not prejudice Dukes, and the verdict on the drug house count was unanimous, as the only problem was related to count two, which was dismissed. This appeal follows.

## II. ANALYSIS.

### A. Sufficiency of Evidence

¶ 12. Dukes contends that, as to the possession with intent to deliver cocaine count, there was insufficient evidence to support a conviction.

¶ 13. The standard for reviewing the sufficiency of evidence in criminal cases is well-settled:

> [I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may

219

not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it.

*State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) (internal citation omitted). Thus, only when the evidence is inherently or patently incredible will we substitute our judgment for the jury's. *State v. Saunders*, 196 Wis. 2d 45, 54, 538 N.W.2d 546 (Ct. App. 1995).

¶ 14. Possession of a controlled substance, cocaine, with intent to deliver, under WIS. STAT. § 961.41(1m), has four elements that are set forth in WIS JI—CRIMINAL 6035. The jury instruction provides:

> The first element requires that the defendant possessed a substance.
>
> "Possessed" means that the defendant knowingly had actual physical control of a substance.
>
> . . . .
>
> The second element requires that the substance was [cocaine].
>
> The third element requires that the defendant knew or believed that the substance was [cocaine] . . .
>
> . . . .
>
> The fourth element requires that the defendant intended to deliver [cocaine]. "Deliver" means to transfer or attempt to transfer from one person to another. "Intended to deliver" means that the defendant had the purpose to deliver or was aware that (his) (her) conduct was practically certain to cause delivery.

WIS JI—CRIMINAL 6035 (footnotes and brackets omitted). Because Dukes was charged with the crime as a party to the crime, the jury could find him guilty either if it

concluded that he directly committed the crime or that he intentionally aided and abetted in the commission of the crime. WIS. STAT. § 939.05.[5]

¶ 15. The parties stipulated that the substance was cocaine and Dukes does not challenge the second element. Dukes does, however, challenge the remaining three elements and submits that there was insufficient evidence to prove that they were present. We disagree.

¶ 16. When police executed the search warrant on June 26, 2004, they found Dukes in the residence asleep on the living room floor. Detective Thrower testified that, in the living room area where Dukes was found, he found "some off-white rocks" that turned out to be crack cocaine. Thrower also testified that he subsequently did a complete walk-through of the residence, which included an inspection of the bedroom in which Deonte was found. He stated that in a purse in that bedroom he found 48.4 grams of crack cocaine, which he described as a "[v]ery large amount," and a large amount of U.S. currency. He explained that the purse also contained 16.5 grams of powdered cocaine. Thrower further testified that police found a body armor vest and explained that he knew from experience that such body armor is often used by drug dealers as protection. He also stated

---

[5] WISCONSIN STAT. § 939.05 provides in part:

(1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

(2) A person is concerned in the commission of the crime if the person:

(a) Directly commits the crime; or

(b) Intentionally aids and abets the commission of it. . . .

that police recovered digital scales from the residence and explained that such scales are used by drug dealers to weigh the drugs prior to sale.

¶ 17. The jury also heard tape recordings of the conversations Dukes had while in jail. At 3:12 p.m., on June 26, 2004, the same day the search warrant was executed, Dukes spoke with a Jimmie. They discussed an eviction notice that the landlord of 450 North 33rd Street had posted, and removing Dukes's belongings from the apartment, including clothes, shoes and a television. Jimmie informed Dukes that he had already removed many of Dukes's clothes and shoes. The two also discussed possible charges against Dukes related to the Glock handgun that police recovered. They also discussed whether police recovered anything from the basement of the building, with Jimmie stating, "the landlord say they came over out the basement with a big ass pistol," and Dukes responding, "I wonder what else they get out that basement[?]"

¶ 18. Later that evening, at 7:36 p.m., Dukes made another call to Jimmie. Dukes and Jimmie discussed whether police had a camera and whether they saw anyone making "transaction[s]":

> JIMMIE: Man, they said they had a camera in the tree.
>
> [DUKES]: They did have a camera in the tree.
>
> JIMMIE: Well, they got a lot of shit on tape, man—
>
> [DUKES]: I know, but they ain't got—
>
> JIMMIE: including when we was out there climbing in the truck.
>
> [DUKES]: They ain't got nothin' on tape, though,

they ain't got us doin' nothin' on tape. They probably got a couple of guns and shit, but they ain't got nobody makin' no transaction.

¶ 19. Jimmie then asked Dukes whether the police "got all the guns," and Dukes responded: "No I heard they only got the Glock and the SKS." Dukes and Jimmie also discussed guns in the basement and whether police found a "big gun." Jimmie then assured Dukes that he had taken all of Dukes's belongings out of the apartment. Dukes then talked to a Wanda, who asked him "what was all in the house," to which Dukes responded, "couple of SKSs, some AKAs," "Glocks" and "dope." Finally, Dukes instructed Jimmie: "don't tell nobody nothin' about nobody, no nothing,' " and later, during the same phone call, similarly instructed an FV, "[h]ey, if anybody asks you all anything over there, don't tell nobody shit," and "act like you don't know nothin.' "

¶ 20. Dukes made yet another call the same evening, and this time spoke to a DeAngelo. They discussed guns, and when DeAngelo stated that police retrieved a big gun from the basement, Dukes asked DeAngelo: "It was the one that was down there, the big long one?" DeAngelo then told Dukes that police would be back to search the basement again, at which point Dukes informed DeAngelo: "I already got somebody across the street watching the house for me," and "I got somebody watchin' over there, so I'm gonna know when they come over and shit. I'm gonna know all who go in there." Dukes then warned DeAngelo, "don't say nothin' just let me know." Dukes also talked to a Bubba and seemed to say that police did not find everything during the search:

> [DUKES]: But they don't got — they don't got shit, they don't got nothin', they don't got nothing', man

cuz the way they was talkin', know what I'm sayin'? They ain't got shit, and then all that shit that they found was in the basement anyway in this apartment building, man –

BUBBA: Okay.

[DUKES]: They don't have nothin'. Only thing that they got that was in the house was the Glock, one of the new guns, and a whole bunch of money, and some "woos," some bags like a 'G' worth of bags, and they got, like, it was like 400 in a cup from like, ah—

BUBBA: How much?

[DUKES]: — like 4, 400 with the "woos," it was like a "G" of, like, 400 with the "woos," a "G," and then 400 with the "woos" and then they found the ten.

¶ 21. In addition, Cotton, Dukes's girlfriend, testified that Dukes did not live at 450 North 33rd Street, Apartment 1. On cross-examination, she stated, however, that Dukes kept clothing, shoes and hats at the apartment, and that she and Dukes frequently spent time there. Although she insisted that Dukes lived with his sister, Cotton admitted that although she had been with Dukes for over a month at the time the search warrant was executed, she had never been to his residence, and the only place she ever saw him was in the apartment at 450 North 33rd Street.

¶ 22. Dukes contends that this evidence is insufficient because there was "no physical evidence linking [him] to the drug house and the drugs in the drug house," because neither his fingerprints nor DNA were on any of the items recovered. He claims he did not live in the apartment, insisting that the evidence shows only that he was found sleeping on the floor where an overnight guest might sleep, and that while police

found mail addressed to both Deonte and Beanland, none was addressed to him. He also asserts that even though he made phone calls from jail, the tapes "do not amount to evidence showing [he] possessed the cocaine found in the drug house beyond a reasonable doubt" because nothing in the tapes shows that he had knowledge or possession of cocaine. We disagree.

¶ 23. We are satisfied that there was sufficient evidence for the jury to find Dukes guilty of possession of cocaine with intent to deliver, as party to the crime. This case does not turn on whether Dukes's fingerprints or DNA were not found on any of the recovered items or on whether mail at the residence was addressed to Dukes. Dukes appears to overlook the fact that even if the State is unable to show that he personally possessed the cocaine with the intent to personally deliver it, to be found guilty as party to the crime the jury need only conclude that he intended to aid and abet in the commission of the crime. *See* WIS. STAT. § 939.05.

¶ 24. The recorded conversations explicitly mentioned drugs and encouraged others to not say anything to anyone, and to act like they do not know anything, clearly indicating that Dukes was well aware of the illegal activities that were going on at 450 North 33rd Street. He also talked about whether police had videotaped any "transaction[s]," speculated about whether a camera had been placed in a tree, and inquired about what police removed from the basement, exhibiting a clear familiarity with the building and the contents of the basement. In addition, the fact that Dukes had someone watching the house and feeding him information about who entered the premises shows that he not only was familiar with the building, but in fact had

control over what took place there and had others observing it on his behalf. Contrary to Cotton's testimony, the evidence also shows that Dukes appeared to indeed live at 450 North 33rd Street: his belongings, that were later transported elsewhere, were all in the apartment, and despite allegedly living with his sister, Cotton, whom Dukes had dated for over a month, had never seen Dukes at any another residence. The evidence shows that Dukes was well aware of the criminal behavior that went on, and was not, as he claims, an overnight guest simply sleeping on the floor. Based on the evidence presented, the jury could reasonably conclude that Dukes aided and abetted in the commission of the crime of possession of cocaine with intent to deliver.

### B. Evidence related to McAdams

¶ 25. Dukes contends that the evidence of McAdams's drug purchase on May 27, 2004, was irrelevant, prejudicial and should not have been admitted.

¶ 26. The question of admissibility of evidence generally lies within the trial court's discretion. *Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. A court properly exercises discretion when it considers the facts of record under the proper legal standard and reasons its way to a rational and legally sound conclusion. *Burkes v. Hales*, 165 Wis. 2d 585, 590–91, 478 N.W.2d 37 (Ct. App. 1991).

¶ 27. Dukes characterizes the evidence about the sale to McAdams as "other acts evidence" within the meaning of Wis. Stat. § 904.04(2), and *State v. Sullivan,*

216 Wis. 2d 768, 771–72, 576 N.W.2d 30 (1998).[6] He contends that the testimony that Detective Carter gave regarding the sale to McAdams, before the trial court decided to disallow further testimony, was evidence that could be used as a basis for a search warrant, but was not relevant to him, and should not have been admitted. He also claims he was unfairly prejudiced by the evidence and that it should therefore have been excluded under Wis. Stat. § 904.03. We disagree.[7]

¶ 28. Wisconsin Stat. § 904.04 generally prohibits the admission of evidence of other acts to prove a defendant's character, and to prove that the defendant acted in conformity with that character, but provides a non-exhaustive list of when other acts evidence is allowed, namely, "as proof of motive, opportunity, in-

---

[6] Wisconsin Stat. § 904.04(2) provides in part:

[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

To determine whether other acts evidence is admissible a court must determine whether the evidence is offered for an acceptable purpose under Wis. Stat. § 904.04(2), whether the evidence is relevant under Wis. Stat. § 904.01, and, if relevant, whether the probative value is substantially outweighed by other considerations under Wis. Stat. § 904.03. *State v. Sullivan*, 216 Wis. 2d 768, 772, 576 N.W.2d 30 (1998).

[7] Wisconsin Stat. § 904.03 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

tent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evidence is not "other acts" evidence if it is part of the panorama of evidence needed to completely describe the crime that occurred and is thereby inextricably intertwined with the crime. *See* Jason M. Brauser, *Intrinsic or Extrinsic?: The Confusing Distinction Between Inextricably Intertwined Evidence and Other Crimes Evidence Under Rule 404(b)*, 88 N.w. U. L. Rev. 1582, 1606 (1994) (discussing Fed. R. Evid. 404(b), which governs the admissibility of other crimes, wrongs or acts). In fact, "simply because an act can be factually classified as 'different'—in time, place and, perhaps, manner than the act complained of—that different act is not necessarily 'other acts' evidence in the eyes of the law." State v. Bauer, 2000 WI App 206, ¶ 7 n.2, 238 Wis. 2d 687, 617 N.W.2d 902 (noting a trend in criminal cases to misidentify evidence as other acts evidence).

¶ 29. Here, Detective Carter testified that he observed the building at 450 North 33rd Street, saw people coming, staying for a few minutes and leaving, and explained that such traffic was consistent with operating a drug house. He admitted, however, that he was unable to see which unit the people who appeared to be purchasing drugs entered. Carter also testified that on May 27, 2004 (approximately one month before the search warrant was executed), a person later identified as McAdams pulled up in a van, entered the building, left two minutes later and drove off, in response to which he and his partner followed the van, eventually stopped it due to a traffic violation, and searched it. At this point defense counsel objected, and, after much discussion, the trial court decided to disallow any more evidence about McAdams.

¶ 30. Dukes mischaracterizes the evidence as other acts evidence. The evidence was not evidence of another act by Dukes, was not introduced for any of the purposes listed in WIS. STAT. § 904.04(2), and was certainly not an impermissible attempt to introduce character evidence about Dukes. Rather, the evidence was introduced to show that Apartment 1 at 450 North 33rd Street was indeed a drug house. This was an element of count three, maintaining a drug house, see WIS. STAT. § 961.42(1), with which Dukes was charged. Thus, even though Dukes erroneously categorizes the evidence as other acts evidence, we disagree with his contention that the evidence was irrelevant because introducing evidence to show that a drug house existed was central to the charge of maintaining a drug house. *See State v. Hammer*, 2000 WI 92, ¶ 25, 236 Wis. 2d 686, 613 N.W.2d 629 (evidence relevant to charged crime is admissible).

¶ 31. We are also not convinced by Dukes's claim that the evidence was unfairly prejudicial under WIS. STAT. § 904.03. "Unfair prejudice arises either when the evidence admitted has a tendency to influence the outcome of the jury deliberations by the use of improper means, or when it arouses in the jury a sense of horror or desire to punish." *State v. Opalewski*, 2002 WI App 145, ¶ 23, 256 Wis. 2d 110, 647 N.W.2d 331. The evidence presented by Carter informed the jury of police surveillance of 450 North 33rd Street, that the behavior they had observed was consistent with the operation of a drug house, and that they searched a car because they suspected that it contained drugs purchased from 450 North 33rd Street and their suspicions were confirmed. In presenting the evidence, the State did not use improper means or arouse a sense of horror or a desire

to punish. *See id*. Moreover, any potential for unfair prejudice was further diminished when the testimony about McAdams's drug purchase was cut short by the judge in response to a defense objection.

## C. *Unanimity of Verdict*

¶ 32. Finally, Dukes also contends that he is entitled to a new trial on counts one and three because the verdicts were not unanimous.

¶ 33. "[T]he right to trial by jury guaranteed in the state constitution includes the right to a unanimous verdict in criminal trials." *State v. Cartagena*, 140 Wis. 2d 59, 61, 409 N.W.2d 386 (Ct. App. 1987). "As a corollary to the unanimous verdict, a defendant has the right to have jurors polled individually." *Id.* at 61–62. "The purpose of jury polling is to test the uncoerced unanimity of the verdict by requiring jurors to take individual responsibility and state publicly that they agree with the announced result." *State v. Raye*, 2005 WI 68, ¶ 18, 281 Wis. 2d 339, 697 N.W.2d 407. An ancillary purpose is to allow jurors to dissent, although previously agreeing to the verdict. *State v. Wiese*, 162 Wis. 2d 507, 518, 469 N.W.2d 908 (Ct. App. 1991). "[I]t has been recognized that, 'the verdict of a jury must be arrived at freely and fairly and that the validity of a unanimous verdict is not dependent on what the jurors agree to in the jury room, but rather upon what is unanimously reported in open court.'" *Raye*, 281 Wis. 2d 339, ¶ 19 (citation omitted).

¶ 34. To test the verdict, the trial court should question a juror who, during the polling, creates some doubt as to his or her vote. *Cartagena*, 140 Wis. 2d at 62.

The poll allows a juror to dissent although previously agreeing. If there is a dissent, or if it is stated by the juror that the assent is merely an accommodation and against the juror's conscience, it is the duty of the court, upon its own motion, to direct the jury to retire and reconsider its verdict. Thus, the threshold question is whether there was an assent, and thus, whether further deliberations were necessary.

*Wiese*, 162 Wis. 2d at 518 (internal citation omitted).

¶ 35. As noted, following the guilty verdicts the court polled the jury. When the court reached Juror 17, the following colloquy took place:

THE COURT: ... Juror Number 17? Were those your verdicts?

JUROR NO. 17: Yes. I did have some problems with some things, but after reading that book and the other things, there was no other answer to come up with. I did have some problems with that.

THE COURT: That creates an issue. Were the verdicts as reached by you unanimous with regards to these matters after reading the book?

JUROR NO. 17: Yes.

THE COURT: So after reading the information, you're saying after reading the information as supplied?

JUROR NO. 17: Yes. There was a problem with the information supplied.

¶ 36. All of the other jurors responded that his or her verdicts were guilty. As a result of the responses by Juror 17, Juror 17 was questioned separately by the court. The following was said:

THE COURT: [Y]ou said after reading the book or books. I'm not sure. You tell me after reading what.

JUROR NO. 17: Well, there was myself and two other guys in there who didn't feel as though when he said that he was party to a crime, I mean, we feel – I felt as though he was party to the crime, but I didn't feel as though he was guilty of the weapon or anything like that.

Then in the book it said that he was in control. Well, I didn't feel as though he could have been in control. Who's to say? It's speculation that he would have grabbed the gun.

. . . .

(Whereupon, discussion held off the record at the bench.)

THE COURT: I appreciate your discussion, your thoughts in that regard. But I have to be limited to what your decision is with regards to this matter.

So having said that, you indicated, going back to the question, you said, well, after looking at the "book." Are you talking about this book, the jury instructions?

JUROR NO. 17: Yes, coincided with the question.

THE COURT: This was the only book you looked to or referenced to?

JUROR NO. 17: Yes, that and the question.

THE COURT: The issue then, as I'm now under-standing it, there were — I guess there were three verdict forms. One, as indicated, was a combination form. The other two were separate as to those events. And in looking at those I started to poll you on those. I want to do that individually. Looking at the verdict as reached on Count 1, there were three questions as posed. One dealt with guilty, not guilty, and the other two were yes or no responses.

232

In looking at those there is an indication — Well, what was your verdict with regards to the charge of possession with intent to deliver a controlled substance, cocaine, as party to a crime?

JUROR NO. 17: No. But —

THE COURT: Wait a minute. Stay with me. Your verdict was not guilty?

JUROR NO. 17: No. I don't think that he –

THE COURT: Are you talking about the gun or what? You have to stay focused on what I'm saying.

JUROR NO. 17: Okay. Read the question to me again.

THE COURT: The question is: As to the count of possession with intent to deliver a controlled substance, cocaine, as party to a crime, what was your verdict on that?

JUROR NO. 17: I didn't feel he was guilty of that.

THE COURT: That he was not guilty?

JUROR NO. 17: No. He –

THE COURT: This represents there was a unanimous verdict?

JUROR NO. 17: That was after they read what was in that book.

THE COURT: Okay.

JUROR NO. 17: If you read the question –

THE COURT: The instructions are that you are to follow the instruction and the law as given to you and take the evidence as presented and the information as to the jury instructions.

JUROR NO. 17: Uh-huh.

THE COURT: Is your verdict at this point in time not guilty?

JUROR NO. 17: Not guilty for that.

THE COURT: Okay. The second charge was as to possession of firearms by a felon. And what's your verdict with regards to that matter?

JUROR NO. 17: Guilty. The first one was guilty. That one with the firearms was the one I said not guilty. I'm sorry, sir.

[ASSISTANT DISTRICT ATTORNEY]: I would suggest that you read the verdict word-for-word to her.

THE COURT: Here's the verdict as written: It says: "We, the jury, find the defendant, Charles E. Dukes, as to the count of possession with intent to deliver a controlled substance, cocaine, as party to a crime, as charged in the first count of the Information, guilty or not guilty."

JUROR NO. 17: He's guilty for the party to the crime, but not with intent to deliver because there was no evidence permitted saying that he –

THE COURT: Okay.

Would you phrase it any other way, Counsel?

[ASSISTANT DISTRICT ATTORNEY]: Why don't you go through the other questions that follow on that form so we get –

THE COURT: "If you find the defendant guilty, you must answer the following questions yes or no: Was the amount of cocaine, including the weight of any other substance or material mixed or combined with it, more than forty grams?"

234

JUROR NO. 17: Yes.

THE COURT: "Before you answer this question yes, you must be satisfied beyond a reasonable doubt that the amount was more than forty grams."

JUROR NO. 17: It was, yes. Yes.

THE COURT: Yes. Two, "Did the defendant commit the crime of possession with intent to deliver a controlled substance, cocaine, as a party to a crime while possessing a dangerous weapon?"

"Before you can answer this question, you must be satisfied beyond a reasonable doubt that the defendant committed the crime while possessing a dangerous weapon and possessing a dangerous weapon to facilitate the crime."

"Yes or no?"

JUROR NO. 17: Yes, he was in possession.

THE COURT: Okay. The second verdict: "We the jury, find the defendant, Charles E. Dukes, guilty of possession of a firearms by a felon, as a party to a crime, as charged in the second count of the Information."

Is that your verdict or not?

JUROR NO. 17: Not. No.

THE COURT: So at this point you're saying you're not voting that way?

JUROR NO. 17: I'm not voting that he I'm voting that he was in possession of the firearm, but I'm not voting that he was in control to the point where that he would grab it.

THE COURT: Okay. The third verdict: "We, the jury, find the defendant, Charles E. Dukes, guilty of

235

keeping a drug house, as a party to a crime, as charged in the third count of the Information."

And what was your verdict in that regard?

JUROR NO. 17: When you read the book coincided with that question, he's found guilty because –

THE COURT: Don't explain it. What is your verdict?

JUROR NO. 17: Guilty.

THE COURT: As to that verdict, it's guilty?

JUROR NO. 17: Yes. That's correct.

THE COURT: All right.

¶ 37. Dukes contends that the colloquy with Juror 17 shows that verdict as to counts one and three were not unanimous because the court cut Juror 17 off on several occasions, the statements by Juror 17 were "confused and coerced," Juror 17 was not allowed to explain herself, and, especially as to count one, Juror 17 stated on numerous occasions that he was not guilty.

¶ 38. We agree with Dukes that the jury verdict as to count one was not unanimous. Juror 17 clearly created doubt as to the unanimity of the verdict and the court properly questioned her separately. *See Cartagena*, 140 Wis. 2d at 62. When the court asked Juror 17 about her verdict on count one, the court, on several occasions, cut Juror 17 off, and in one instance reminded her that the verdict form represented that the jury had reached a unanimous verdict:

THE COURT: ... Well, what was your verdict with regards to the charge of possession with intent to deliver a controlled substance, cocaine, as party to a crime?

JUROR NO. 17: No. But –

THE COURT: Wait a minute. Stay with me. Your verdict was not guilty?

JUROR NO. 17: No. I don't think that he –

THE COURT: Are you talking about the gun or what? You have to stay focused on what I'm saying.

JUROR NO. 17: Okay. Read the question to me again.

THE COURT: The question is: As to the count of possession with intent to deliver a controlled substance, cocaine, as party to a crime, what was your verdict on that?

JUROR NO. 17: I didn't feel he was guilty of that.

THE COURT: That he was not guilty?

JUROR NO. 17: No. He –

THE COURT: This represents there was a unanimous verdict?

■

¶ 39. Juror 17 clearly hesitated and was confused by the numerous questions she was asked. The judge repeatedly cutting off Juror 17 resulted in a situation where we will never be entirely sure of the juror's thoughts, and the juror may have been uncomfortable trying to explain her views of the evidence. It would also appear that the judge stressing that the verdict "represents there was a unanimous verdict" may have placed

pressure on Juror 17 not to change her vote. The court's reference to the unanimous verdict reached by the jury in the jury room was also contrary to the dictates of *Raye* because it is not a unanimous verdict given in the jury room that counts; rather, it is whether the verdict stated in open court is unanimous. *See id.*, 281 Wis. 2d 339, ¶ 19.

¶ 40. A short while later, when the court continued to count two, Juror 17 appears to change her mind and states: "Guilty. The first one was guilty. That one with the firearms was the one I said not guilty. I'm sorry, sir." The court then, at the State's suggestion, proceeded to read the verdict form word for word and again cut Juror 17 off as she was responding to whether she found Dukes guilty or not guilty as to count one:

> THE COURT: Here's the verdict as written: It says: "We, the jury, find the defendant, Charles E. Dukes, as to the count of possession with intent to deliver a controlled substance, cocaine, as party to a crime, as charged in the first count of the Information, guilty or not guilty."
>
> JUROR NO. 17: He's guilty for the party to the crime, but not with intent to deliver because there was no evidence permitted saying that he –
>
> THE COURT: Okay.

¶ 41. Thus, after Juror 17 seemed to state that her verdict on count one was guilty after all, when the court read the verdict word for word, rather than responding guilty or not guilty, Juror 17 began to explain her reasoning. The court cut her off, however, and did not allow her to finish her explanation. Even though Juror 17 went on to answer affirmatively the subsequent questions concerning the amount of cocaine

and the possession of a gun, she never told the court whether her verdict on count one was guilty or not guilty.

¶ 42. We are satisfied that the judge's unfortunate interruptions, and insistence that the form showed a unanimous verdict, strongly suggests that Juror 17 may have felt pressure and intimidation, and that she may have misunderstood the verdict reached in the jury room. *See Raye*, 281 Wis. 2d 339, ¶ 19. We are also satisfied that, even though the juror expressed agreement with the subsequent statements, because Juror 17 was cut off when attempting to answer whether she found Dukes guilty or not guilty on count one, and never actually gave an answer, Juror 17 cannot be said to have found Dukes guilty on count one. Consequently, the verdict on count one was not unanimous.

¶ 43. With respect to count three, we are satisfied that the verdict was unanimous. With regard to this count, the following was said:

> THE COURT: Okay. The third verdict: "We, the jury, find the defendant, Charles E. Dukes, guilty of keeping a drug house, as a party to a crime, as charged in the third count of the Information."
>
> And what was your verdict in that regard?
>
> JUROR NO. 17: When you read the book coincided with that question, he's found guilty because –
>
> THE COURT: Don't explain it. What is your verdict?
>
> JUROR NO. 17: Guilty.
>
> THE COURT: As to that verdict, it's guilty?

239

JUROR NO. 17: Yes. That's correct.

¶ 44. This shows that the court again cut Juror 17 off when she appears to have tried to explain her reasoning; however, immediately thereafter, Juror 17 stated twice that her verdict was guilty. The colloquy regarding count three is also significantly shorter and shows much less confusion than the one vis-à–vis count one, and the court did not make reference to the unanimous verdict the jury reached in the jury room the way the court did with respect to count one. We are thus satisfied that the guilty verdict on count three was unanimous.

¶ 45. Accordingly, we affirm the conviction on the maintaining a drug house count, but reverse the conviction on the possession of a controlled substance count, and remand to the trial court for a new trial on grounds that the verdict reached on that count was not unanimous.

By the Court.—Judgment and order affirmed in part; reversed in part and cause remanded with directions.