# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2017AP2364-CR

†Petition for Review filed

Complete Title of Case:

> **STATE OF WISCONSIN,**
>
> **PLAINTIFF-RESPONDENT,†**
>
> **V.**
>
> **DAVID GUTIERREZ,**
>
> **DEFENDANT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | July 3, 2019 |
| Submitted on Briefs: | January 29, 2019 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Reilly, P.J., Gundrum and Hagedorn, JJ. |
| Concurred: | |
| Dissented: | Hagedorn, J. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Chris A. Gramstrup* of *Gramstrup Law Office*, Superior. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Daniel J. O'Brien*, assistant attorney general, and *Brad D. Schimel*, attorney general. |

## COURT OF APPEALS
## DECISION
## DATED AND FILED

### July 3, 2019

**Sheila T. Reiff**
**Clerk of Court of Appeals**

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2017AP2364-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2012CF115

**IN COURT OF APPEALS**

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

DAVID GUTIERREZ,

  DEFENDANT-APPELLANT.

        APPEAL from a judgment and an order of the circuit court for Green Lake County:  W. ANDREW VOIGT, Judge.  *Reversed and cause remanded*.

        Before Reilly, P.J., Gundrum and Hagedorn, JJ.

        ¶1     REILLY, P.J. David Gutierrez appeals from his conviction for three counts of first-degree sexual assault of a child under the age of thirteen, three counts of incest with a child by a stepparent, and three counts of child enticement.

Gutierrez argues that the circuit court erroneously admitted other acts evidence, erroneously denied the admission of DNA evidence, denied him an impartial jury, and that trial counsel was ineffective for failing to call a witness at trial. We conclude that the circuit court erred in denying the admission of the DNA evidence and that the error was not harmless. We reverse and remand for a new trial.

## BACKGROUND

¶2      In 2012, twelve-year-old A.R. alleged that she had been sexually assaulted by Gutierrez, her stepfather, on at least three occasions and forced to watch pornographic movies. Gutierrez was charged with three counts of first-degree sexual assault of a child under thirteen, three counts of child enticement, three counts of incest with a child by a stepparent, and one count of exposing a child to harmful material.[1]

¶3      Prior to trial, Gutierrez moved to admit evidence from the Wisconsin State Crime Lab that the underwear the victim wore during the assault did not show any evidence of Gutierrez's DNA, but did have DNA from five male individuals, and that a swab taken from the outside of A.R.'s mouth the day after the assault did not include any of Gutierrez's DNA, but did include the DNA of

---

[1] *See* WIS. STAT. §§ 948.02(1)(e), 948.06(1m), 948.07(1), 948.11(2)(a) (2011-12). All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

three male individuals.[2]  None of the DNA came from saliva or semen.  The State objected on rape shield grounds, arguing that the results would "imply that [A.R.] had sexual [contact] with other males.  It invites the jury to speculate on the source of the DNA to the prejudice of the victim."

¶4     In ruling on the DNA evidence, the circuit court allowed Gutierrez to introduce evidence that DNA testing was performed and that Gutierrez's DNA was not found but refused Gutierrez's motion to offer evidence that other males' DNA was found.  The court allowed the State, however, to "explore why or why not [Gutierrez's DNA] may or may not have been found there."  Gutierrez objected, arguing that the DNA evidence from the other individuals was

> important to counter the State's argument [that] you wouldn't expect to find any [DNA]….  Again, we are not going to get into how it got there, but it was found to counter the State's position that you wouldn't expect to find it … and we need to specify what was found. Otherwise, again, [the] jury doesn't get the complete story and [the] State gets to argue for, you know, reasons why his DNA wasn't found.  We don't get to counter it.

¶5     At trial, Gutierrez called the crime lab analyst who testified that the underwear and mouth swabs belonging to A.R. contained no evidence of

---

[2] The crime lab performed tests on multiple items, including a t-shirt, some pajama pants, some swabs from three locations in the residence, some swabs from A.R., and two pairs of underwear belonging to A.R.  The State claims that one pair of underwear was provided by Gutierrez's wife and was retrieved from the washing machine wet.  The second pair was retrieved from the laundry hamper and provided by A.R., who told police this was the pair she was wearing the night of the assault.  Neither pair was the same color as the underwear A.R. reported to officers she was wearing the evening of the assault in her initial interview.  According to the crime lab report, one pair of underwear did not contain male DNA and one pair of underwear contained "a mixture of DNA from five or more male individuals."  We cannot establish from the record which pair of underwear—the pair from the washing machine or the pair from the hamper—contained the DNA evidence, but we will assume that the underwear that A.R. removed from the hamper and told police she was wearing the night of the assault tested positive for male DNA.

Gutierrez's DNA. On cross-examination, the following exchange occurred between the State and the analyst:

> State: Now, in terms of DNA itself, can it be washed off?
>
> Witness: Yes, it can.
>
> State: Can it be scrubbed off?
>
> Witness: Yes.
>
> State: Can it be wiped off?
>
> Witness: Yes.
>
> ….
>
> State: If there was biological material on the person's body and that person showered, cleansed themself, wiped themself off, might you expect something would happen to the biological or DNA material?
>
> Witness: Yes, I would.
>
> State: What do you think?
>
> Witness: Basically, if you are washing or wiping, the more this is done, the more likely you are removing any kind of DNA that was deposited.

¶6　The jury was not allowed to hear that despite showering, cleansing, wiping, and washing, all DNA was not removed, and, in fact, DNA from other persons was present on the underwear provided by A.R. and a swab from the outside of A.R.'s mouth. Gutierrez appropriately argues that the State was allowed to present favorable evidence, namely that it was reasonable to not find Gutierrez's DNA due to A.R. washing and cleansing, while he was denied the ability to rebut that evidence by showing that what the State was implying was not true. The State's response to this "unfairness" argument is perfunctory at best; the State argues only that the DNA evidence is not relevant to the issue at trial and "would only prejudice and confuse the jury."

¶7      After a three-day trial, the jury found Gutierrez not guilty of exposing a child to harmful materials and guilty on all other counts, and he was sentenced to a lengthy prison term.[3]  Gutierrez appeals.

## DISCUSSION

¶8      While Gutierrez makes a number of arguments on appeal, we address in detail only the issue that we find dispositive:  the circuit court's decision on the admissibility of the DNA evidence.  Gutierrez argues that the circuit court erroneously exercised its discretion when it denied his request to use the DNA evidence as rebuttal to the State's testimony as to why DNA evidence was not found.[4]  We review a decision to admit or exclude evidence for an erroneous exercise of discretion.  *State v. Warbelton*, 2009 WI 6, ¶17, 315 Wis. 2d 253, 759 N.W.2d 557.  We will uphold the circuit court's ruling if it "examined the relevant facts, applied a proper standard of law, and, using a demonstrated

---

[3] The circuit court denied Gutierrez's motion for postconviction relief seeking a new trial.

[4] Gutierrez frames his argument as erroneous exercise of the circuit court's discretion. He does not suggest that his constitutional rights were violated, except for the inclusion of one sentence about the fundamental right of a criminal defendant to present a defense in his reply brief.  We note, however, that the Confrontation Clause and the Compulsory Process Clause of the Sixth Amendment protect a defendant's right to present a defense.  U.S. CONST. amend. VI; WIS. CONST. art. I, § 7; *State v. Pulizzano*, 155 Wis. 2d 633, 645, 456 N.W.2d 325 (1990).  "The former grants defendants the right to 'effective' cross-examination of witnesses whose testimony is adverse, while the latter grants defendants the right to admit favorable testimony." *Pulizzano*, 155 Wis. 2d at 645-46 (citation omitted).  This right is not absolute, however, and is subject to a determination that the evidence is relevant and is not substantially outweighed by its prejudicial effect. *Id.* at 646; *see also* WIS. STAT. § 904.03.  Regardless of whether this issue is framed as an erroneous exercise of the circuit court's discretion or as a violation of Gutierrez's constitutional rights, we conclude that Gutierrez is entitled to a new trial.

rational process, reached a conclusion that a reasonable judge could reach." ***Loy v. Bunderson***, 107 Wis. 2d 400, 415, 320 N.W.2d 175 (1982).

*DNA Evidence*

¶9      We agree with the circuit court that the fact that Gutierrez's DNA was *not* found on the swabs or underwear of A.R. *was* relevant, "absolutely important" evidence, and, therefore, admissible.[5]  We also agree that the court did not err in allowing the State to offer testimony that washing or cleaning may remove DNA from clothing or body parts.  Where we disagree with the circuit court is its ruling that allowed testimony pertaining to why Gutierrez's DNA may have been absent (washed off) but denied Gutierrez the right to rebut the State's evidence by showing that the DNA of several individuals was not washed off.  By allowing the State to present evidence that DNA can be easily washed off but not allowing Gutierrez to rebut that theory, the jury was incorrectly led to believe that the underwear and mouth swabs contained no DNA evidence.  Testimony at trial indicated that the evening before A.R. reported the assault, Gutierrez removed A.R.'s underwear twice, put his mouth on her vagina, and put his penis in her mouth.  Based on this testimony, the presence or lack thereof of Gutierrez's DNA on the underwear or mouth swab was clearly relevant, and especially relevant in

---

[5] In order for evidence to be admissible, it must be relevant.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  WIS. STAT. § 904.01.  The probative value of relevant evidence must also not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  WIS. STAT. § 904.03.

rebuttal, to the State's offer that Gutierrez's DNA was not there because it was washed off.

¶10    The State does not address Gutierrez's argument that offering this rebuttal DNA evidence was critical given the testimony from the crime lab expert. The State argues that the DNA evidence is inadmissible as it "would prejudice the victim by creating the forbidden inference that she may have had sexual contact or intercourse with one or more other men (or boys)."[6]  We disagree.  The offer of the DNA evidence was to counter the State's argument that Gutierrez's DNA was washed off, rather than evidence concerning her "prior sexual conduct."[7]  The circuit court erroneously exercised its discretion in refusing to allow the DNA evidence for rebuttal.

---

[6]  WISCONSIN STAT. § 972.11(2)(b), the rape shield law, provides, in relevant part:

> (b) If the defendant is accused of a crime under [the enumerated statutes], any evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct shall not be admitted into evidence during the course of the hearing or trial, nor shall any reference to such conduct be made in the presence of the jury, except the following, subject to [WIS. STAT. §] 971.31(11):
>
> 1. Evidence of the complaining witness's past conduct with the defendant.
>
> 2. Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.
>
> 3. Evidence of prior untruthful allegations of sexual assault made by the complaining witness.

[7]  "'[S]exual conduct' means any conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life-style." WIS. STAT. § 972.11(2)(a).

¶11    An erroneous ruling on the admission of evidence is subject to a harmless error analysis. *Martindale v. Ripp*, 2001 WI 113, ¶30, 246 Wis. 2d 67, 629 N.W.2d 698. "If the error did not affect the substantial rights of the party, the error is considered harmless." *Id.* "An error affects the substantial rights of a party if there is a reasonable probability of a different outcome, meaning a 'probability sufficient to undermine confidence in the outcome.'" *State v. Kleser*, 2010 WI 88, ¶94, 328 Wis. 2d 42, 786 N.W.2d 144 (citation omitted).

> We use several non-exclusive factors to aid our application of the harmless error rule in the evidentiary context: (1) the frequency of the error; (2) the importance of the erroneously included or excluded evidence to the prosecution's or defense's case; (3) the presence or absence of evidence corroborating or contradicting the erroneously included or excluded evidence; (4) whether erroneously excluded evidence merely duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case.

*State v. Monahan*, 2018 WI 80, ¶35, 383 Wis. 2d 100, 913 N.W.2d 894. The State made no argument as to whether the exclusion of the evidence was harmless error. *See State v. Harris*, 2010 WI 79, ¶32, 326 Wis. 2d 685, 786 N.W.2d 409. We conclude the error in this case was not harmless.

¶12    In summarizing the applicable factors in *Monahan*, we recognize that this case was largely a case involving competing testimony: A.R.'s testimony versus Gutierrez's testimony. Without corroboration of A.R.'s allegations, the DNA evidence, both the presence and lack thereof, was a critical piece of evidence. As previously discussed, the lack of Gutierrez's DNA was central to his defense. The State's case was improperly bolstered when the jury was indirectly presented with a fact not in evidence, i.e., that no DNA was present as it had been washed off. Allowing the State's proffer that Gutierrez's DNA had been washed

off while denying Gutierrez his right to rebut that evidence was error and undermines our confidence in the trial's outcome.[8]

*Other Acts Evidence*

¶13    For purposes of remand, we address Gutierrez's other acts argument. Prior to trial, the State sought to admit other acts evidence involving A.R.'s allegations that when she was six years old Gutierrez had sexual contact with her in a closet.  The circuit court initially refused to allow "any specific acts of alleged sexual contact," only allowing "events leading up to the first charge of sexual contact" to indicate "how those came to pass and for why the reporting happened when it happened."  The State filed a motion to reconsider, and the court modified its previous decision and allowed the evidence pertaining to the earlier sexual assault based on its review of *State v. Davidson*, 2000 WI 91, 236 Wis. 2d 537, 613 N.W.2d 606, and the greater latitude rule used in child sexual assault cases.

¶14    As we have often repeated, Wisconsin courts apply a three-step analysis, established in *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998), to determine whether to admit other acts evidence, and we apply a "greater latitude rule" in admitting other acts evidence in child sexual assault cases. *Davidson*, 236 Wis. 2d 537, ¶¶44, 46; *see also* WIS. STAT. § 904.04(2)(b).  The greater latitude rule allows "a 'greater latitude of proof as to other like occurrences'" in "sexual

---

[8] Because we conclude that Gutierrez is entitled to a new trial, we do not reach his arguments regarding his right to an impartial jury and ineffective assistance of counsel as the record will likely change on retrial. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989).  We do briefly address Gutierrez's "other acts" argument as that issue is likely to reoccur.

assault cases, particularly cases that involve sexual assault of a child." ***Davidson***, 236 Wis. 2d 537, ¶36 (citation omitted).

¶15 Gutierrez argues that the amorphous nature of the allegations "precluded Gutierrez from providing a reasonable response" and that the prejudicial nature of the allegations outweighed the probative value of the evidence.[9] We conclude that the circuit court properly applied an "other acts" analysis and reached a reasonable conclusion based on the specific facts of this case. The six-year-old sexual assault is probative because it is similar to the current charges: it is the same child; the location of the sexual assault, a closet, is consistent with the current allegations as they were either in the home or in a secluded location; Gutierrez took actions to conceal his behavior from A.R.'s mother and said it was a secret; and the sexual conduct was similar in that A.R.'s allegations are not more or less extreme than the current charges. *See **id.**,* ¶68; *see also **Sullivan***, 216 Wis. 2d at 787-88. As the court explained in ***Davidson***, the "defendant's past offense need not be identical to the charged offense in order to be probative." ***Davidson***, 236 Wis. 2d 537, ¶72. Further, the jury was given a limiting instruction, which served to counteract the potential for unfair prejudice. *See **id.**,* ¶78. Under the circumstances and given the applicability of the greater latitude rule, we conclude that the circuit court did not erroneously admit the other acts evidence.

---

[9] The State argues that the evidence was not other acts evidence, but rather "panorama evidence," referencing ***State v. Dukes***, 2007 WI App 175, ¶28, 303 Wis. 2d 208, 736 N.W.2d 515, where this court explained that "[e]vidence is not 'other acts' evidence if it is part of the panorama of evidence needed to completely describe the crime that occurred and is thereby inextricably intertwined with the crime." We do not agree with the State that a separate sexual assault that took place six years before the charged offense can be considered part of the "panorama of evidence needed to completely describe the crime that occurred." *See **id.***

*By the Court.*—Judgment and order reversed and cause remanded.

No. 2017AP2364-CR(D)

¶16 HAGEDORN, J. (*dissenting*). A jury of his peers concluded that David Gutierrez sexually assaulted his stepdaughter. I am sympathetic with the majority's conclusion that justice would have been better served had the trial court allowed Gutierrez to present evidence regarding the presence of unidentified mixtures of male DNA on two items that were tested. But this case, like so many, turns on our standard of review. The majority cites the standard of review, but fails to actually apply it; I respectfully dissent.[1]

¶17 While Gutierrez makes a one-sentence passing reference to his constitutional right to present a defense, he develops no argument along these lines. Therefore, we review this evidentiary decision simply for an erroneous exercise of discretion. Where there has been no legal or factual error—and none is alleged here—we are left with the very narrow job of determining whether the trial court engaged in a rational decision-making process and then arrived at a rationally defensible position. *State v. Dorsey*, 2018 WI 10, ¶37, 379 Wis. 2d 386, 906 N.W.2d 158 ("We will uphold a circuit court's evidentiary ruling if it 'examined the relevant facts, applied a proper standard of law, used a demonstrated rational process and reached a conclusion that a reasonable judge could reach.'" (citation omitted)). It is important to emphasize that we do not, as a general matter, look to whether the decision was more or less fair to any individual

---

[1] I do not find any of Gutierrez's other challenges to his conviction persuasive. I will confine my analysis here to my disagreement with the dispositive issue leading to the majority's reversal.

party. We do not decide whether the evidentiary decision calls into question the fairness of the underlying trial—at least when the claim before us merely asks whether the court erroneously exercised its discretion.[2] Rather, the question is this: Is the decision completely off-the-wall, one that was made without any rational foundation or thought, indeed one that no minimally competent judge could reach?

¶18 There are sound reasons for this extraordinarily deferential approach. In the main, our system is structured to leave basic fairness calls to our trial courts, while granting appellate courts only the limited role of reviewing for legal error. This reflects the fact that we weren't at the trial; there's a lot that goes on in a courtroom that can't be discerned from cold words on a paper transcript. This structure is why, for example, trial courts are entrusted with sentencing decisions, among the most humbling powers a judge can exercise. And in my nearly four years on the bench, I cannot recall our court ever second-guessing a sentence (absent legal error), even when we all would have made a different decision ourselves. Maybe this is good, maybe it could be improved, but it's the system we have and one we must follow.

¶19 And pertinent to this case, it is the trial court that has the awesome responsibility and duty to make evidentiary decisions in the course of a trial. Where someone's life and liberty are at stake, as they are in criminal trials, these many decisions large and small have massive ramifications on the overall fairness

---

[2] No claim under WIS. STAT. § 752.35 (2017-18) has been made, wherein our decision would be a gut check on the fundamental fairness of the proceedings. Nor does the majority invoke this or any other similar legal basis to examine how fair the trial was to the defendant.

2

of a trial. Yet, our system recognizes the frailty of human judgment, accepts some measure of imperfection, and limits appellate court review of these incredibly consequential moment-by-moment judgment calls. Again, it does this in recognition of the trial court's better view of what's really going on, and in the service of finality and justice for crime victims and a society that asks us to administer justice on their behalf.

¶20    In this light, I read the majority as more offended by the unfairness of the trial court's decision than as a considered effort to apply the standard of review. Even while paying the standard of review lip service, nowhere does the majority attempt to show that the decision was the kind of irrational, thoughtless decision it must be for us to overturn it.

¶21    At the outset, the record is clear that the parties' arguments were not given short shrift. This was not a split-second decision that in hindsight is hard to justify. Rather, it was the subject of a pretrial motion that included briefing and zealous argument by both sides. The trial court was very engaged, going back and forth with the attorneys on how best to balance the interests and keep it fair for both sides. Without question, the trial court engaged in a "demonstrated rational process." *Dorsey*, 379 Wis. 2d 386, ¶37 (citation omitted). Thus, the only real question is whether a reasonable judge could reach the decision reached here.

¶22    It is important to put the test results here in context. The DNA analyst conducted testing on multiple items and from multiple areas: in and around the victim's vaginal area, inside and outside her mouth, swabs from areas of the home where the assaults were alleged to have taken place, and multiple items of clothing from the victim. The analyst found no semen, saliva, or hairs of note, nor was male DNA detected on most of the items. In particular, no male

3

DNA was detected in various tests of samples from the vaginal area, nor was male DNA found in the swabs from inside her mouth. However, the analyst did find a mixture of DNA from three or more unidentified men on one of the peri-oral swabs—that is, swabs from outside the mouth. Also, of the various pieces of clothing analyzed—a t-shirt, pajama pants, and two pairs of underwear—a swab from the inside of one of the underwear items contained a mixture of male DNA from five or more individuals. The analyst concluded that Gutierrez was excluded as a contributor to either DNA mixture.

¶23 This evidence was obviously favorable to Gutierrez, and he sought to have all of it admitted over the State's objection. The State sought to exclude the results from the underwear and peri-oral swab. The State pointed out that outside of knowing there was no semen or saliva, no one knew where the DNA came from or even what it was. The State explained that the various swabs were taken almost twenty-four hours after the alleged assault, and that the victim had in the meantime "[urinated], defecated, wiped or washed her genital area, took a bath or shower, drank fluids, gargled or 'swished' in her mouth, brushed her teeth and changed her clothing."

¶24 The State's position was that the relevant evidence had likely been cleaned off due to these activities, and that an effort to introduce evidence regarding the unidentified mixture of male DNA would invite confusion and speculation, adding more heat than light to the jury's deliberations. The jury might, the State maintained, speculate regarding the source of this DNA in a way that could suggest other sexual activity, and this would be prejudicial to the victim.

¶25 Regarding the underwear, the State emphasized the unreliability of the sample. When the search warrant was being conducted, the house was filled with the general chaos of young children running around, yelling by the victim's mother, and what appeared to be intense efforts to clean the home. In the police report, the victim had reported the underwear she was wearing the night the November 1, 2012 assault took place was purple. But no purple underwear was ever turned over. Instead, the victim's mother "retrieved a wet yellow and pink floral pair from the washing machine." When the victim was asked for the purple underwear, she produced "another floral pair that were not purple in color, either," having "pulled them out of some laundry." The victim indicated she wore those on November 2, which was the day after the assault. Thus, the State made a strong case that the underwear results (it is unclear which pair of underwear contained the mixture of male DNA) would lead to jury speculation that maybe she had sexual contact with other men, and that the results were not even reliable in the first place because of the contaminated nature of the evidence and the doubt about whether either pair of tested underwear was the pair she was wearing during the assault.

¶26 The court took all of this very seriously in its oral hearing on the defendant's motion. Gutierrez stressed to the court that he should be able to present the male DNA that was found to rebut the State's argument that the DNA had likely been removed through cleaning or other activities. Gutierrez disclaimed any interest in suggesting the victim had sexual contact with others, only that DNA was actually found.

¶27 The State responded by reiterating the essentially unknown nature of the DNA that was found. It pointed out that this was a peri-oral, not oral swab, and that introducing evidence of multiple other men would surely lead the jury to

5

speculate that sexual contact with other men was involved; this was, the State asserted, the inevitable thought process the jury would go down. The State further maintained that in light of all the cleaning and washing she did, "there just would be no reason to expect that one would find bodily fluid from the Defendant in her oral cavity or near her oral cavity." The State further reiterated its argument that there were good reasons to think the underwear tested was not the same underwear that was worn during the November 1 assault, not to mention the risk of contamination when it was pulled out of a pile of dirty laundry.

¶28 Gutierrez replied that the presence of DNA supported his theory that DNA "isn't destroyed easily." Gutierrez also indicated that the underwear she pulled out of the laundry pile was in fact the one she said she was wearing during the assault.

¶29 Taking this all in, the trial court began by accepting Gutierrez's arguments regarding the general relevance of the DNA test results. But it expressed deep concern about going further because no one could really pinpoint what the mixture of male DNA was:

> Apparently, it's not saliva. It's not semen so if we don't know what it is, it could be a skin cell, it could be a hair follicle, who knows what, and the relevance of that is extraordinarily limited, especially when the only likely inference that could be drawn is directly related to what the rape shield statue would prohibit otherwise.
>
> ….
>
> The problem is that the only reasonable inference that's drawn in the Court's opinion about the source of all this without wild speculation by both parties that can be substantiated by no one as to the source of this other [DNA] really makes that, it just it can't be relevant because it can't be explained in any reasonable fashion that Court can envision.

¶30    The court then further noted that it might see this differently if the victim had gone to the nurse right away.  But with the "substantial passage of time" from an evidentiary perspective, this could lead to a "rabbit hole from which we never escape."  The court was concerned about inundating the jury with evidence regarding the ordinary ways DNA could show up in random places if each side gets to try to explain that.

¶31    However, and quite importantly, the court explicitly stated that Gutierrez could "still explore why or why not [Gutierrez's DNA] may or may not have been found there."  In other words, Gutierrez had free rein to discuss the likelihood that Gutierrez's DNA would still be found after cleaning, wiping, passage of time, etc.  The court reiterated this multiple times, saying, "And the Court doesn't view that limitation as prohibiting you from addressing the issues directly with the witness about how long [DNA] would be viable, for example, circumstances under which it could still be found at greater lengths of time than those that were factually here."

¶32    In short, the court found the mixture of male DNA not particularly helpful since it was unclear what it was or where it came from.  The court was concerned that exploring what this unidentified mixture of random male DNA was could lead the jury to speculate down impermissible paths and might confuse them.  And, wanting to ensure Gutierrez could support his theory that the absence of his DNA was meaningful, the court gave Gutierrez the liberty to present evidence of why the jury should take seriously the fact that Gutierrez's DNA was not found.

¶33    The trial testimony itself was fairly straightforward.  Gutierrez called the DNA analyst and elicited testimony that DNA can be passed on in these types

7

of assaults, and that none of Gutierrez's DNA was found on any of the tested items or samples.

¶34    On cross-examination, the State elicited testimony regarding DNA's ability to be removed. The relevant conversation was as follows:

> State:  Now, in terms of DNA itself, can it be washed off?
>
> Witness:  Yes, it can.
>
> State:  Can it be scrubbed off?
>
> Witness:  Yes.
>
> State:  Can it be wiped off?
>
> Witness:  Yes.
>
> ….
>
> State:  If there was biological material on the person's body and that person showered, cleansed themself, wiped themself off, might you expect something would happen to the biological or DNA material?
>
> Witness:  Yes, I would.
>
> State:  What do you think?
>
> Witness:  Basically, if you are washing or wiping, the more this is done, the more likely you are removing any kind of DNA that was deposited.
>
> State:  If someone had ejaculate in her mouth and then 24 hours later, her mouth was swabbed, within that intervening period the person had eaten, drank, brushed teeth, gargled, washed face, might you expect something would happen to the ejaculate or biological material in the mouth?
>
> Witness:  Yes. I would have expected it basically to be gone.
>
> State:  Why?
>
> Witness:  The mouth actually has a lot of enzymes in it, things that would break down material. Hence, it's the start

of your digestive system. But also you are also producing saliva so your mouth is always being washed.

¶35 At this point, Gutierrez could have, pursuant to the court's pretrial ruling, made the case that following these events DNA would likely remain. But no efforts along these lines were made.

¶36 In view of the trial court's careful consideration of the arguments that were made, I have no trouble affirming its exercise of discretion.[3]

¶37 A rational judge no doubt could be legitimately wary of jury speculation in light of the unidentified nature of the DNA found. A rational judge could certainly have concerns over the reliability of the underwear sample. A rational judge might very well not want the trial to turn into a never-ending battle of trying to explain these unidentified mixtures of male DNA, what kinds of random cells containing DNA are passed along in ordinary life, etc.—a "rabbit hole from which we never escape" as the trial court described it. A rational judge might, as did trial court here, find these DNA mixtures fairly unreliable and uninformative in light of the "substantial passage of time" between assault and test.

¶38 In short, applying the standard of review that merely looks to the baseline coherency of the trial court's decision, I cannot see how we can do anything but affirm, even granting that a better choice might have been warranted. The trial court's decision was well-considered, and one that easily survives our

---

[3] When reviewing an exercise of discretion, we are free to proffer reasons supporting the trial court's decision even outside of reasons actually given. *State v. Cain*, 2012 WI 68, ¶37 n.10, 342 Wis. 2d 1, 816 N.W.2d 177. This makes the State's case even stronger.

9

extraordinarily deferential review. The trial court did not erroneously exercise its discretion, and the conviction should be affirmed.