COURT OF APPEALS
DECISION
DATED AND FILED

June 29, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.  **2020AP261-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2014CF5313**

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DAVID WAYNE ROSS,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: TIMOTHY G. DUGAN and JEFFREY A. WAGNER, Judges. *Affirmed*.

Before Brash, P.J., Graham and White, JJ.

¶1 WHITE, J. David Wayne Ross appeals his judgment of conviction for two counts of second-degree sexual assault. He also appeals the order denying his motion for postconviction relief without a hearing. Ross argues that his trial

counsel was ineffective for choosing an unreasonable trial strategy claiming there was evidence of text message manipulation and for failing to object to testimony tying Ross to drugs, drug use, and drug paraphernalia. Further, Ross argues that the real controversy has not been tried. We reject Ross's arguments and, accordingly, we affirm.

## BACKGROUND

¶2     Ross was charged with two counts of second-degree sexual assault, contrary to WIS. STAT. §§ 940.225(2)(a) and 939.50(3)(c) (2019-20)[1] and one count of misdemeanor battery, domestic abuse, contrary to WIS. STAT. §§ 940.19(1), 939.51(3)(a), and 968.075(1)(a)1. The complaint alleged that Ross caused bodily harm to D.D.W. on November 18, 2014, and that he had sexual intercourse with D.D.W. without her consent and by use of force in two incidents on November 19 and 20, 2014.

¶3     Ross pleaded not guilty to all charges and the trial[2] commenced in July 2014. The opening statements from the State and defense made clear that credibility was of tantamount importance because Ross claimed that the acts D.D.W. described, and that the State charged as sexual assault, were consensual sex. During the trial, the State called multiple Milwaukee Police Department officers and detectives, including the officer who responded to D.D.W.'s 911 call on November 20, 2014, the detective who processed Ross's apartment after he was

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] The Honorable Timothy G. Dugan presided over Ross's trial and sentencing; we refer to him as the trial court. The Honorable Jeffrey A. Wagner presided over Ross's postconviction motion; we refer to him as the circuit court.

detained, the detective and officer from the Sensitive Crimes Division who investigated D.D.W.'s allegations, and the officer who responded to a 911 call from the Village Inn on November 18, 2014. The State also presented a DNA analyst from the State Crime Laboratory and a Sexual Assault Nurse Examiner who examined D.D.W.

¶4 The State also called D.D.W., who testified that she had been staying at the Salvation Army for three months, where she got to know, befriended, and "sort of started kind of dating" Ross. About two weeks before the incidents, Ross invited her to stay at his new apartment, which she accepted "instead of staying in the car" after she was kicked out of the Salvation Army.

¶5 D.D.W. testified about the November 18, 2014 incident, in which she alleged Ross hit her and choked her inside her car, resulting in a call to the police.[3] She went to the Village Inn, where a friend, Brian B., was staying, and met with police about the battery incident with Ross. D.D.W. did not return to Ross's apartment that night, although they texted multiple times after they

---

[3] Because Ross was acquitted on the battery charge based on the November 18, 2014 incident, we discuss the allegations only as far as they impacted the timeline of events.

separated. The State introduced an exhibit of photographs of text messages on D.D.W.'s cell phone.[4]

¶6 D.D.W. testified that the next day, on November 19, 2014, she went to Ross's apartment to pick up her clothing and medication. When she arrived, "the first thing I did when I got there was take my medication because it was late in the day, and I didn't have any of my morning medicine. After that, I basically couldn't leave." She testified that Ross followed her around the apartment, even into the bathroom, and stood in front of the apartment door and would not let her leave.

¶7 D.D.W. testified that Ross "grabbed" her and "got on top of [her] and had [her] pinned down" while he questioned her about what she told the police the day before. Ross hit her on the side of her face and her head, and he "would

---

[4] The photographs of the text messages were admitted as State's Exhibit 60, and copies were distributed to the jury during D.D.W.'s testimony. As the 7th Circuit did in ***United States v. Mitchell***, 353 F.3d 552, 555 n.4 (7th Cir. 2003), we will not use "[sic]" to indicate errors or mistakes in the text of this text message conversation because such conversations are often informal and involve typographical errors, shorthand, and abbreviations. The first message from 1:38 p.m. on November 18, 2014, was Ross telling D.D.W. that she was "blowing this out of proportion" and D.D.W. responded "you know dam well I'm not. You shouldn't of choked me hit me nothing and you know it." Ross sent over thirty messages after that until about 8:45 p.m. Ross's early messages reference the fact that D.D.W. called the police, saying "If u love somebody u don't. Call the police and make them lose everything." In later messages, Ross tells D.D.W. that "U need to get your stuff and go. U told people the wrong things. Please get your stuff or ill throw it out…" Ross also texted D.D.W. four messages about Brian, telling her to "Go to Brian" and "u keep wanting Brian." D.D.W. texted Ross approximately five times on November 18, reminding him that he "la[id] hands" on her and that she had the "dam bruises to prove it." There are over thirty more messages from Ross to D.D.W. on November 19, before about 2:30 p.m. Ross asked in several messages for D.D.W. to "come pick me up and stop this." Ross texted D.D.W. that he "need[ed] help" and he needed to "get them th[]e paper work." D.D.W. texted Ross approximately ten times on November 19, her messages included, "I didn't screw anything up you did," "All u care about is yourself your beer and smoking crack. You screwed up your life I didn't," and "I need to get my stuff especially my meds. I don't want any problems later when I come over alright. You caused enough damage to me and yourself."

do that after every time [she] told him that [she] already answered his question, that he already knew; and all he would say is, when I ask you a question, you answer me." Ross threatened to kill her, to "take [her] in the bathroom and drown [her] in the bathtub." Ross wanted her "to lie to the police and tell them that [her] friend [Brian] put [her] up to it" and that Ross did not hit her. He wanted her to drop the charges because the charges were "going to ruin everything. He was going to lose his schooling, his job, his apartment; and he was going to get five years."

¶8 D.D.W. testified that Ross followed her into the bathroom, and told her if she loved him, she would perform fellatio. She did "out of fear that he would start hitting [her] again while [she] was … using the bathroom." She testified that Ross was using crack cocaine and drinking beer.

¶9 D.D.W. testified that the first sexual assault happened at about 1:00 a.m. on November 20, 2014, when she "[woke] up to him trying to pull [her] pants down. He pulled [her] pad off, and he pulled [her] tampon out, and he proceeded to have sex with" her. D.D.W. described that there was penis-to-vagina and penis-to-anus intercourse without her consent. D.D.W. testified that she was sure Ross knew she did not want to have intercourse because "he said, don't make me hurt you." After the assault, D.D.W. laid there until Ross was asleep, then she "got up, got dressed, put [her] boots and stuff on because [she] was going to sneak out." Ross woke up and asked if she was trying to sneak out. She was afraid of getting hit again. Ross made her lay back down and they went to sleep.

¶10 D.D.W. testified that when they woke up on the morning of November 20, 2014, it was okay until about 11 a.m. Ross "tried pulling [her] pants down again; and he again pulled [her] tampon out again and had sex with

[her] with his penis" in both her "vagina and anus." Ross also put his fingers in her anus. D.D.W. testified she called 911 after Ross left the apartment. An ambulance and police responded.

¶11 Ross took the stand in his own defense. He testified that he and D.D.W. were driving around together in her car on November 18, 2014, when they had an argument. He described that they "were just pushing and shoving each other." He stated that D.D.W. wanted to see her friend Brian "basically because they wanted to exchange drugs again." Ross left the car and walked away. Ross and D.D.W. texted repeatedly after he left car. During questioning regarding a text from D.D.W. accusing him of caring only about beer and smoking crack, Ross denied using crack or drinking alcohol.

¶12 Ross testified that on November 19, 2014, he arranged by text and phone to meet D.D.W. at McDonald's near his apartment. He described D.D.W. as disheveled, bleeding, and hungry. D.D.W. wanted to go to his apartment to get her medications, and they both went to the apartment. Ross denied that he hit or caused injury to D.D.W., instead stating that Brian had hurt her before she arrived. Ross left D.D.W. in the apartment alone on November 19. After D.D.W. took a shower and a nap, Ross stated that he and D.D.W. had consensual sex. He then went to class, and came back around 9 p.m. On the morning of November 20, 2014, Ross said he went to McDonald's for them both and then later went out to pick up soda for both of them and was arrested by the police on his walk back.

¶13 We now recite a summation of testimony relevant to Ross's claims of ineffective assistance of counsel: (1) that trial counsel failed to object to references to drug use and paraphernalia, and (2) that trial counsel pursued a factually inaccurate theory about missing or altered text messages.

*References to drugs*

¶14     When the State called to the stand the Milwaukee Police Department Sensitive Crimes Division detective who investigated D.D.W.'s allegations against Ross, the prosecutor asked the detective if he knew what a Chore Boy was. The detective explained that a Chore Boy can be used to clean a kitchen, but also is used as a filter for crack cocaine. The detective testified that a Chore Boy was recovered from a kitchen drawer in Ross's apartment. Trial counsel did not object to this testimony. On cross-examination, the detective verified that the Chore Boy was not listed in his inventory or police report and that its existence had not been raised in any materials before that day of trial.

¶15     Trial counsel also questioned the detective about the evidence collected compared to what D.D.W. told the police during their investigation. The detective testified that D.D.W. told him that Ross had been drinking gin all night; however, he confirmed that the police found no gin, no gin bottles, no glasses half full of gin, no residue or smell of alcohol, and no beer. The detective testified that the police found absolutely no proof of any crack pipes or crack residue in the apartment.

¶16     During D.D.W.'s direct examination by the State, she testified that Ross had been drinking beer and other alcohol and she recalled seeing beer cans in the apartment when she left on November 20, 2014. She also testified that Ross was using crack cocaine, but denied that she used crack or got high on pills. She testified that Ross had hidden a crack pipe in one of her boots; "[i]t was a glass pipe … about five inches long[.]" She testified that she placed it "on the little opening between the living room and the kitchen … on that ledge." The State showed D.D.W. a photograph of the ledge between the living room and the

kitchen, a photograph taken by police when they secured the apartment after she called 911 on November 20, 2014. D.D.W. was unable to identify a crack pipe in the photo. Trial counsel did not object to these questions.

¶17 The Milwaukee Police Department Sensitive Crimes Division officer who investigated D.D.W.'s allegations testified that D.D.W. told him that Ross was smoking crack and drinking beer and gin. The officer testified in the search of Ross's apartment, the police found no crack, crack pipe, beer or gin.

*References to missing or altered text messages*

¶18 On direct examination, D.D.W. reviewed the photographs of text messages conversations between D.D.W. and Ross and D.D.W. and Brian from November 18-20, 2014. When questioned if all of the texts were photographed and none were deleted, D.D.W. testified that the photographs showed "[a]ll the ones between [her] and [Ross] and a few between [her] and [Brian] where he called when he said he called the police." An officer testified that he took photographs of the texts on November 29, 2014. The officer testified that D.D.W.'s phone was not secured by the police from the incident until they took photos of the text messages. The officer confirmed that the police did not do a digital download of the phone.

¶19 In the defense case, a private investigator associated with trial counsel's firm testified that there are ways of manipulating text messages as they appear on the phone, but she could not explain how such manipulation would occur. Trial counsel's law firm's intern prepared a chart cross-referencing D.D.W.'s cell phone call and SMS text message records, which were both obtained by subpoena from D.D.W.'s cell phone provider. The intern testified that the chart showed that there was a text from Ross to D.D.W. on November 18,

2014, that did not appear in the State's exhibit of photographs of D.D.W.'s text messages. The records also showed that there were two outgoing SMS texts from D.D.W. to Brian at 10:55 a.m. and 10:57 a.m. on November 20, 2014, and neither text was included in the State's photographs of D.D.W.'s text message conversations.

¶20    When Ross testified in his own defense, he testified that he did not see five MMS text messages[5] from D.D.W. in the State's Exhibit 60, one on November 18, 2014 and four on November 19, 2014. Ross testified that he did not

---

[5] The text of the MMS messages are produced here without alteration or correction of typographical, grammatical, or spelling errors, or the use of [sic]. *See **Mitchell***, 353 F.3d at 555 n.4. The 4:09 p.m. message from D.D.W.: "Hope u know u left bruises in me and my throat hurts too. Would of never gotten this far if you didn't put your hands on me so quite denying it and you can't touch my stiff cuz I told the police what u said about it."

The 7:57 a.m. message from D.D.W.: "You hurt me. Bruises where u hit me and choked me. Hurts to swallow now, I'm gonna have to go get checked out cuz of taking blood thinners and the bruising u left."

The 9:17 a.m. message from D.D.W.: "Be a man and own up to what u did. You can't and u won't. If u did care you would not of hit me choked me trying to kill me. Take responsibility for your actions. A real man and real Marine would. You won't so you're neither one."

The 12:13 p.m. message from D.D.W.: "After yesterday I don't want to be alone with u. You hurt me bad and I can't let you do that to me again told u I've been there done that and not going thru it again."

The 12:20 p.m. message from D.D.W.:

> You don't abuse or try to kill someone you say u care about and
> want to be with. I'm not the one who needs to grow up you do if
> u think it's OK to hit n choke me n act like it was nothing. I
> have the bruises and the pain you caused me and it is not OK.

send the SMS text message[6] shown in the State's Exhibit 60, claiming to be sent from his phone to D.D.W. at 1:23 p.m. that started, "I gave Dave your message." Ross stated that the message was "out of context in the body of the text log" and that he is "David" and he does not refer to himself as "Dave."

¶21    The State called a rebuttal witness, an intelligence analyst for the Milwaukee County District Attorney's Office.  The analyst testified that SMS text messages stay within the cell phone company's system, whereas MMS text messages are "sent to the recipient via the internet."  The analyst reviewed the defense subpoena for records from D.D.W.'s cell phone carrier, and noted that the defense requested texts and got SMS, but the defense did not specifically request MMS messages, which means it did not get MMS messages in the records produced.

¶22    On cross-examination, trial counsel asked the analyst whether in her training and experience, "there are ways to present fake text messages[?]"  The analyst responded, "Define fake text messages."  Trial counsel then stated, "To falsify so it looks like it is received by someone even though it wasn't sent by the person that it presents to be."  The analyst responded, "I have never come across in any of my cases [a] fake text message in my experience."

¶23    In his closing argument, trial counsel admitted he "screwed up as a defense attorney when [he] didn't subpoena the MMS messages," and that "it

---

[6] "The two-part 1:23 p.m. message from Ross started and it is produced here without alteration:  "I gave Dave your message and he said he been texting u all day and no more.  He said u don't talk to him on the phone and he ain't texting no more, Bad th" and continued "ing happened to him because he walked all day in the cold.  He still walking be left his phone inside cause it was freezing."

wasn't until yesterday that he learned from" the State's rebuttal witness that he, in "pursuit of [his] defense of [his] client, screwed that up. So maybe that's not evidence." Then trial counsel stated "maybe it is" evidence, and reiterated that Ross "testified he never saw those messages; and we know that MMS messages mean that they are coming from some sort of Internet source, and we heard my investigator testify that there are ways to manipulate text messages. She doesn't know how because it's technical."

¶24 After a five-day trial in July 2015, the jury found Ross guilty on both counts of sexual assault, but not guilty on the count of battery. Ross filed a postconviction motion in July 2019 requesting a new trial on the ground that he was denied effective assistance of counsel. The circuit court denied Ross's motion without a hearing in December 2019. This appeal follows. Additional facts are included in the discussion.

## DISCUSSION

¶25 Ross argues that he was denied effective assistance of counsel because trial counsel chose an unreasonable strategy based on an erroneous belief that D.D.W. manipulated text messages and that trial counsel failed to object to— or make a motion to exclude—irrelevant and prejudicial testimony regarding drug use and paraphernalia before trial or to object to the same at trial. Ross asserts that the cumulative effect of these deficiencies prejudiced his defense. As a result, he seeks a new trial or, at minimum, a *Machner*[7] hearing. Further, Ross contends

---

[7] *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

11

that the real controversy has not been tried and requests we order a new trial pursuant to WIS. STAT. § 752.35. We reject Ross's arguments.

## I.     Ineffective assistance of counsel

¶26     "A defendant alleging ineffective assistance of counsel is not entitled to an evidentiary hearing as a matter of right." *State v. Reynolds*, 2005 WI App 222, ¶7, 287 Wis. 2d 653, 705 N.W.2d 900. "A hearing on a postconviction motion is required only when the movant states sufficient material facts that, if true, would entitle the defendant to relief." *State v. Allen*, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433. "Whether a motion alleges facts which, if true, would entitle a defendant to relief is a question of law that we review de novo." *State v. Bentley*, 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996). "[I]f the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," the trial court has discretion to deny a postconviction motion without a hearing. *Allen*, 274 Wis. 2d 568, ¶9. We review the trial court's decision to deny an evidentiary hearing under the erroneous exercise of discretion standard. *See id.*

¶27     In order to succeed on his postconviction motion, Ross must allege sufficient material facts to satisfy the familiar two-prong inquiry to show ineffective assistance of counsel:  deficiency and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must show specific acts or omissions of counsel that are "outside the wide range of professionally competent assistance." *Id.* at 690. To prove prejudice, a defendant must show that counsel's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. *Id.* at 687. "The

defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. We need not address both *Strickland* inquiries if the defendant fails to make a sufficient showing on either one. *Id.* at 697.

¶28 For Ross's first claim, he argues that trial counsel was deficient for failing to object to testimony about drug use and paraphernalia because that information would be other-acts evidence, and the trial court had previously granted the defense's motion *in limine* barring other-acts evidence. As using crack cocaine is criminal activity, Ross argues that trial counsel could have objected to testimony about drug use or drug paraphernalia and therefore, under *State v. Sullivan*, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998), the trial court would have not admitted the testimony.[8] The State argues that the trial court would have denied the objection because the evidence was relevant and probative of Ross and D.D.W.'s credibility; however, we note that the State does not name a permissible purpose under the first prong of *Sullivan*.[9] Further, the State contends that trial

---

[8] "[T]he admissibility of other acts evidence" is governed by a "three-step analysis." *State v. Sullivan*, 216 Wis. 2d 768, 771, 576 N.W.2d 30 (1998). The first prong is whether the other acts evidence is offered for an acceptable purpose under WIS. STAT. § 904.04(2), "such as establishing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Sullivan*, 216 Wis. 2d at 772. The second prong is whether the other acts evidence is relevant as examined in WIS. STAT. § 904.01. *Sullivan*, 216 Wis. 2d at 772. The third prong is whether the probative value of the other acts evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence" as examined in WIS. STAT. § 904.03. *Sullivan*, 216 Wis. 2d at 772.

[9] We are also not persuaded that the drug reference evidence is panorama evidence because the State has not shown how the evidence was needed to completely describe the crime and was thus intertwined in the context of the sexual assaults. *See State v. Dukes*, 2007 WI App 175, ¶28, 303 Wis. 2d 208, 736 N.W.2d 515.

counsel made a strategic choice not to object to the drug references because D.D.W.'s allegations were uncorroborated and the absence of evidence related to drugs or drug paraphernalia would hurt her credibility. The State relies on *Strickland*'s holding that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.*, 466 U.S. at 690.

¶29 For Ross's second claim, he argues that trial counsel acted on a factually inaccurate premise that MMS text messages were missing from D.D.W.'s phone company records and thus, D.D.W. had tampered with the evidence. The State argues that Ross testified to not seeing the MMS text messages, endorsing trial counsel's strategy. The State asserts that a defendant cannot show deficient performance when counsel rationally pursued a defense theory based on discussions with the defendant and the evidence expected at trial. *See State v. Breitzman*, 2017 WI 100, ¶71, 378 Wis. 2d 431, 904 N.W.2d 93.

¶30 Under these facts and circumstances, the State at least partially attributes trial counsel's performance to strategic choices. Without a *Machner* hearing, we hesitate to assign trial strategy to trial counsel's tactics. *See id.*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) ("We cannot otherwise determine whether trial counsel's actions were the result of incompetence or deliberate trial strategies."). Ross's material facts in support of his motion contend that trial counsel was deficient and not acting in a strategic manner. Ross argues we should reject the State's argument to the contrary. Because in assessing a postconviction motion, we assume the proposed material facts are true and because it is not clear in the record that trial counsel's choices were strategic, the most efficient analysis is to assume trial counsel was deficient on both counts and

focus our inquiry on whether Ross was prejudiced by these actions. Our analysis does not shake our confidence in the outcome of the trial.

### A. Drug use and paraphernalia references did not prejudice Ross

¶31 When we consider Ross's first claim, that trial counsel's failure to object to the introduction of evidence alleging Ross used drugs and possessed drug paraphernalia, we see no evidence of prejudice. In isolation, the jury heard D.D.W.'s claims that Ross was using crack and drinking, but also heard multiple police officers testify that no crack, crack residue, crack pipes, or for that matter gin or beer was found in Ross's apartment. Overall, the evidence in this case was more than sufficient to support Ross's convictions. D.D.W.'s account of what happened was plausible and, despite minor inconsistencies, matched the physical evidence and the timeline established in the text messages. Despite defense efforts, there was no major blow to D.D.W.'s credibility, nor was there corroborated evidence of Ross's alternative version of the incident. We assess that the evidence admitted—without addressing a *Sullivan* analysis—did not impugn Ross's credibility such that our confidence in the trial outcome is shaken. Ross fails to provide facts that show that the verdict would have been different but for an absence of D.D.W.'s uncorroborated testimony about the presence of drugs.

¶32 Having concluded that trial counsel's representation did not prejudice Ross's defense, Ross has failed to show that trial counsel was ineffective. *See Strickland*, 466 U.S. at 694. Ross's allegations that the trial outcome would be different are conclusory. Our review of the record conclusively demonstrates that Ross is not entitled to relief because trial counsel's failure to object to uncorroborated drug references did not prejudice Ross's defense. Therefore, the circuit court's denial of his motion without a hearing on his first

claim of ineffective assistance was not an erroneous exercise of discretion. *See Allen*, 274 Wis.2d 568, ¶9.

### B.     Allegedly altered or missing text messages did not prejudice Ross

¶33     Ross focuses his second ineffective assistance claim on trial counsel failing to live up to a promise to the jury made in his opening statement:  that the State's evidence of D.D.W.'s text messages "do not match the objective evidence of the certified phone records from the phone company.  These have been tampered with by [D.D.W.]"  Ross asserts that trial counsel failed to subpoena all of the text messages from D.D.W.'s account and then, acting on the factually incomplete record, formulated a theory of defense to the jury that missing text messages were proof of D.D.W.'s manipulation.

¶34     Ross argues that in a case that hinged on credibility, trial counsel diminished Ross's credibility by making a factually inaccurate argument about MMS text messages.  We have previously concluded that an attorney was ineffective when "[c]ounsel was wrong on the law and the facts" with regard to the promise counsel made in his opening statement that his client would testify because he had to and it was defense counsel's decision to make.  *State v. Coleman*, 2015 WI App 38, ¶43, 362 Wis. 2d 447, 865 N.W.2d 190.  Ross argues trial counsel similarly damaged his credibility.  He asserts that trial counsel was wrong on the facts and that prejudiced his defense.  However, the record reflects that Ross endorsed this position and also testified to never seeing these text messages.  Ross additionally testified that he did not remember another SMS text message where the message author appeared to refer to himself in the third person.

¶35     Trial counsel attempted to undermine D.D.W.'s credibility throughout the trial.  Our inquiry requires us to consider whether the claim that

D.D.W. manipulated text messages prejudiced Ross in the context of his defense. *See* ***State v. Balliette***, 2011 WI 79, ¶24, 336 Wis. 2d 358, 805 N.W.2d 334. The allegedly altered text messages were only one part of trial counsel's use of D.D.W.'s phone records to attack her credibility. Trial counsel raised credibility issues with the accuracy of the State's evidence of Ross and D.D.W.'s text messaging. Trial counsel pointed out that the text messages evidence was created through photographs of D.D.W.'s phone, that the photographs were taken nine days after the incident and that in those nine days, the police did not have the phone secured. Additionally, trial counsel raised a credibility issue about D.D.W.'s claim that she was on the phone with 911 during the battery incident on November 18. Trial counsel also raised a credibility issue about when D.D.W. had access to her phone, in effect questioning why she did not call for help sooner. Trial counsel used D.D.W.'s phone records to show that she had intermittent outgoing activity on her phone on November 19, and that she had access to her phone from around 10:00 a.m. on November 20—when she made outgoing calls to Walgreens, a medical clinic, a medical supply store, and cell phone customer support—before she called 911 at 1:34 p.m.

¶36 Ross offers conclusory allegations that the text message manipulation marred his credibility such that the jury verdict was impacted. However, he does not allege sufficient material facts to support that assertion. The text message manipulation argument was just one of many attacks on D.D.W.'s credibility based on her phone records. The jury was aware of these inconsistencies in D.D.W.'s testimony and Ross has failed to allege any facts to disturb the jury's guilty verdicts on the two counts of sexual assault. We conclude that there was no reasonable probability of a different outcome if trial counsel's allegations of text message tampering—while factually inaccurate from the

17

evidence at trial—had not been made. Consequently, Ross has not shown prejudice and this ineffective assistance of counsel claim fails. *See Strickland*, 466 U.S. at 694. We conclude that the record conclusively demonstrates that Ross was not entitled to relief on his postconviction motion; therefore, the circuit court did not erroneously exercise its discretion to deny his motion without an evidentiary hearing. *See Allen*, 274 Wis. 2d 568, ¶9.

### C. *Cumulative deficiencies did not prejudice Ross*

¶37 Ross argues that the cumulative deficiencies in trial counsel's performance prejudiced his defense. We recognize that "the cumulative effect of several deficient acts or omissions may, in certain instances, also undermine a reviewing court's confidence in the outcome of a proceeding." *State v. Thiel*, 2003 WI 111, ¶60, 264 Wis. 2d 571, 665 N.W.2d 305. Ross argues that under the totality of the circumstances, trial counsel's failures to object to the drug references and trial counsel's factually inaccurate argument about text message tampering caused prejudice from the cumulative deficiencies. Ross's argument is conclusory, resting on the idea that because counsel was deficient in multiple ways, we should conclude there was prejudice. Considered individually or cumulatively, Ross's claims fail to show that but for either issue, the jury's credibility determinations or verdicts would have been different. We remain confident in the fairness of the trial. For purposes of Ross's postconviction motion, Ross offers only conclusory allegations of cumulative deficiency being prejudicial to his defense. *See Allen*, 274 Wis. 2d 568, ¶9. Therefore, we conclude the circuit court's denial of Ross's motion was a reasonable exercise of discretion.

## II. *Interest of Justice*

¶38 Ross argues that the true controversy has not been tried and seeks a new trial in the interests of justice. This court may order a new trial pursuant to WIS. STAT. § 752.35 when the real controversy has not been fully tried or when it is probable that justice has miscarried. "The power to grant a new trial in the interest of justice is to be exercised 'infrequently and judiciously.'" *State v. Avery*, 2013 WI 13, ¶38, 345 Wis. 2d 407, 432, 826 N.W.2d 60 (citation omitted).

¶39 We may conclude that a case was not fully tried "when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case." *State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996). We may conclude that "justice has miscarried if 'there is a substantial probability that a new trial would produce a different result.'" *See State v. Kucharski*, 2015 WI 64. ¶5, 363 Wis. 2d 658, 866 N.W.2d 697 (citation omitted). Ross fails to show that his case meets these standards. As Ross admits, this case came down to the determination by the jury about who was more credible about what happened. There is no basis to disturb the jury's verdicts. Accordingly, we reject Ross's request for a new trial in the interest of justice.

## CONCLUSION

¶40 We conclude that in order to secure a *Machner* hearing on a postconviction motion for ineffective assistance of counsel, Ross must provide more than conclusory allegations that would show he is entitled to the relief he seeks. Because the record also conclusively demonstrates that he is not entitled to relief, we conclude the circuit court did not erroneously exercise its discretion when it denied Ross's motion without a hearing. Furthermore, we affirm his judgment of conviction.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.

¶41    GRAHAM, J. (*dissenting*).    Ross claims that his trial counsel's strategy to undermine D.D.W.'s credibility by showing that she manipulated text messages was unreasonable, and that it prejudiced his defense.  I conclude that the circuit court should have held a ***Machner*** hearing on this claim.  Therefore, I dissent.

¶42    It is undisputed that Ross had sex with D.D.W. at his apartment on November 19 and 20, 2014.  The dispositive question is whether these sexual encounters were consensual.  There is no physical evidence that weighs one way or another on that question.  The jury's decision about whether to convict Ross of sexual assault turns on credibility—whether the jury believed D.D.W., or whether the jury instead believed Ross.

¶43    I agree with the majority that Ross wasn't prejudiced by his trial counsel's failure to object to D.D.W.'s testimony that Ross was drinking gin and smoking crack at his apartment on the weekend in question.  If anything, that testimony would have undermined D.D.W.'s credibility with the jury.  It is difficult to believe that D.D.W. was telling the truth about Ross's use of drugs and alcohol, given that there was no evidence of drugs or alcohol (except the presence of a Chore Boy—a copper scrubbing pad sold in most convenience stores and found in many kitchens) when police arrived at Ross's apartment without warning on November 20.

¶44    The majority steers clear of the State's argument that letting this testimony in was a strategic choice on trial counsel's part, and rightly so.  Yet, as the majority explains, the record conclusively demonstrates that Ross was not

prejudiced by counsel's decision to not object. Far from it, D.D.W.'s uncorroborated allegation of drug use would have undermined her credibility and helped Ross's case. If the jury believed that D.D.W. was lying about Ross's drug and alcohol use, the jury could reasonably infer that D.D.W. would also be willing to fabricate other allegations to get Ross in trouble.

¶45 As for other aspects of D.D.W.'s credibility, trial counsel anticipated that he would score a knock-out punch at trial. After counsel subpoenaed D.D.W.'s telephone records, he discovered that some messages that appeared on the police photographs of D.D.W.'s phone were missing from the telephone company's records. It appears that counsel thought he had found a smoking gun that would conclusively prove that D.D.W. fabricated evidence against Ross. And counsel communicated that opinion, both to Ross and to the jury. In a letter to Ross, counsel stated: "I am fairly confident that the phone record will destroy [D.D.W.'s] testimony and her statements about what happened on 11/18-11/20." In his opening argument, counsel told the jury that "the most troubling part is that these photos [of D.D.W.'s phone] do not match the objective evidence of the certified phone records from the phone company." He then presented the testimony of an intern, who had compiled a chart identifying discrepancies between the photos and the telephone company's records. This intern testified about each of the text messages that was missing from the records, and counsel highlighted these discrepancies.

¶46 As it turned out, the smoking gun that trial counsel had promised never went off. Unbeknownst to counsel, the reason that the messages failed to appear in the phone records was benign—they were MMS messages, and according to an intelligence analyst in the district attorney's office, MMS messages would not appear in telephone company records unless specifically

requested in the subpoena. After this was revealed at trial, counsel admitted that he made a mistake by not subpoenaing the messages. Counsel told the jury: "I screwed up as a defense attorney when I didn't subpoena the MMS messages." He explained that the purportedly missing text messages "looked to me as a defense attorney like a big deal," until he learned through the intelligence analyst's testimony that "[m]aybe that isn't."

¶47 It is deficient performance to embrace a trial strategy without a reasonable investigation of the facts. *See, e.g.*, **State v. Domke**, 2011 WI 95, ¶53, 337 Wis. 2d 268, 805 N.W.2d 364. Ross has sufficiently alleged that counsel's performance was deficient.[1]

¶48 Contrary to the majority, I cannot conclude that this uninformed choice of strategy did not prejudice Ross's defense. It appears that D.D.W.'s credibility was significantly damaged at trial, both due to the absence of any evidence to corroborate her allegations of Ross's drug and alcohol use, and also through other aspects of trial counsel's cross examination. If the jury disbelieved D.D.W. about the drugs and alcohol, there is a reasonable probability that that would have been enough to secure an acquittal on the sexual assault charges—except that counsel promised conclusive proof that she falsified text messages and that proof fell flat. Under these circumstances, I conclude that there is a reasonable probability that the jury would have been less likely to acquit based on

---

[1] I do not agree that Ross can be faulted on this record for endorsing trial counsel's strategy. *See* majority op., ¶29. To be sure, Ross testified that he had not seen the five MMS text messages that D.D.W. sent on November 18 and 19, 2014. Yet these MMS messages were five of dozens exchanged in a heated argument; it is unsurprising that Ross would not remember the content of specific messages that he received eight months before the trial, especially after being told by his attorney that these messages were not reflected in the telephone company records.

evidence that, although short of conclusive, was more than enough to create a reasonable doubt.

¶49    For these reasons, I conclude that Ross's claim of ineffective assistance of counsel should have proceeded and I would reverse the circuit court order denying Ross's postconviction motion and remand for a *Machner* hearing. Accordingly, I respectfully dissent.